**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NANCY THOMER, | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | No.    10-CV-375 |
| | : | |
| ALLSTATE INSURANCE COMPANY, | : | |
| | : | |
| Defendant | : | |
| | : | |

**ROBERT F. KELLY, Sr. J.**                                                **May  9, 2011**

**MEMORANDUM**

Presently before the Court are a Motion for Summary Judgment filed by Defendant,

Allstate Insurance Company ("Allstate"), a Response in Opposition to Allstate's Motion for

Summary Judgment ("Opposition") filed by Plaintiff, Nancy Thomer ("Thomer"), a Reply

Memorandum ("Reply") filed by Allstate, and a Surreply filed by Thomer.  For the reasons set

forth below, we will grant Allstate's Motion for Summary Judgment in part and deny it in part.

**I.      FACTS**

This case stems from Allstate's alleged bad faith handling of Thomer's Underinsured

Motorist ("UIM") claim.  Because Thomer argues that Allstate's bad faith conduct stems from

"years of delayed investigation and unreasonable offers" we feel that a detailed account of the

facts involved in this case is warranted.

On April 15, 2002, Thomer was involved in a motor vehicle accident ("MVA") caused by

another motorist.  (Allstate Ex. 2.)  The issue of fault regarding the MVA is not in dispute.  At all

times relevant to this claim, Allstate was Thomer's insurer.  (Compl. ¶ 6.)  The nature and of

extent of the injuries sustained by Thomer as a result of the MVA represent a point of sharp

disagreement between the Parties.  The alleged injuries include but are not limited to:

> personal injuries to [Thomer's] entire head, neck, back, shoulders, abdomen, torso and extremities, closed head injury with cognitive deficits, a serious shock to the nerves and nervous system, traumatic brain injury, traumatic concussion, traumatic injuries to the cervical, lumbar, dorsal and thoracic spine, the muscles, nerves, nervous system, broad vision, vestibular dysfunction,[1] myofacial disease[2] and the sequalae thereof . . .

(Compl. ¶ 9) (footnotes added).  Thomer claims that these injuries are permanent.  (Id.)

Furthermore, Thomer claims that, due to these injuries, she is no longer able to earn an income.

(Allstate Ex. 3 at ALL1209-11.)

### A.    Thomer's Medical Treatment

On the day of the MVA, Thomer repeatedly declined emergency medical care and

arranged for a friend's husband to drive her home instead.  (Allstate Ex. 3 at ALL1201.)  Two

days after the accident on April 17, 2002, Thomer visited Dr. Paul Baron, D.O. ("Dr. Baron"), an

osteopathic healthcare provider who is familiar with craniosacral manipulation,[3] with complaints

regarding her head, neck, arm, back and tingling in both arms and legs.  (Id.)  Dr. Baron

diagnosed Thomer with a closed head injury and referred Thomer to several specialists.  (Allstate

Ex. 8).  Dr. Baron continued to treat Thomer with craniosacral therapy until Allstate discontinued

---

[1] The vestibular system includes the parts of the inner ear and brain that process sensory information involved with controlling balance and eye movement. http://www.vestibular.org/vestibular- disorders.php.

[2] We assume Thomer means "Myofascial Pain Syndrome," which is a chronic form of muscle pain centered around sensitive points in the muscle. http://www.mayoclinic.com/health/myofascial-pain- syndrome/DS01042.

[3] Proponents of Craniosacral Therapy assert that mobility restrictions or misalignments along the cranial sutures will disturb rhythmic flows of cerebralspinal fluid, which in turn has an adverse effect upon health.  (Allstate Ex. 8.)  Proponents argue that manual manipulation is necessary to restore normal function within the body.  Id.

coverage in June of 2003 (Opposition at 4).

On May 8, 2002, Thomer went to Doylestown Hospital complaining of pain secondary to the accident. (Allstate Ex. 6 at 2.) However, a cervical spine study showed only minor degenerative changes. (Allstate Ex. 11 at 1.) An MRI of the brain was normal (Id. at 2) as was an MRI of the cervical spine (Id, at 3). Also on May 8, 2002, Thomer visited an ophthalmologist, Dr. Jeffrey H. Cohen, M.D., complaining of blurred vision in both eyes secondary to the accident and trouble focusing after reading. (Allstate Ex. 11.) Dr. Cohen diagnosed Thomer with "blurred vision, probably secondary to concussion" and he explained to her that it "should improve with time" and asked her to return in a month's time for a follow-up exam. (Id.) Dr. Cohen did not indicate whether he reviewed Thomer's medical records prior to the examination. (Id.)

On June 5, 2002, Thomer underwent a physical therapy evaluation at Doylestown Hospital. (Allstate Ex. 3 at 52-53.) She then participated in physical therapy sessions, twice weekly, for approximately ten weeks but she felt that it was only worsening her condition. (Id. at 53.) In August of 2002, Dr. Baron referred Thomer for a neurologic examination with Dr. Roy A. Jackel, M.D. (Allstate Ex. 12 at 1.) On August 14, 2002, Dr. Jackel diagnosed Thomer with post-concussive syndrome[4] and post-traumatic myofascial sydrome.[5] (Id. at 2.) He also

---

[4] Post-Concussive Syndrome is a disorder in which a combination of post-concussion symptoms such as headaches and dizziness last for weeks and sometimes months after the injury that caused the concussion.
http://www.mayoclinic.com/health/post-concussion-syndrome/DS01020.

[5] See fn. 2, supra.

recommended that Thomer submit to an Electroencephalogram ("EEG")[6] and formal

neuropsychological testing. (Id.) On October 9, 2002, Thomer had an abdominal ultrasound

performed at Doylestown Hospital, the result of which was "normal." (Allstate Ex. 13.)

In October of 2003, Dr. Baron referred Thomer for a second neurological examination

with Dr. W. Stover Wiggins, M.D. On October 8, 2003, Dr. Wiggins summarized Thomer's

neurological exam as non-focal and diagnosed her with a closed head injury. (Allstate Ex. 15.)

He recommended that she have a repeat MRI of the brain and cervical spine and to have "Evoked

Potential"[7] studies as well. (Id.) On October 16, 2003, Thomer returned to Doylestown Hospital,

where she underwent a cervical spine MRI that revealed mild degenerative disc disease (Allstate

Ex. 15 at 1) and a brain MRI was normal. (Id. at 2). Also on October 16, 2003, Dr. Wiggins

performed three tests on Thomer. Dr. Wiggins performed a Brainstem Auditory Evoked

Potential test ("BAEP"),[8] which resulted in a diagnosis of "abnormal" and an audiogram result of

"mild bilateral hearing loss." (Allstate Ex.16 at 1.) He also performed a Visual Evoked Potential

test ("VEP")[9] on Thomer and found that her results were normal. (Allstate Ex. 16 at 2.) Dr.

---

[6] An EEG detects electrical activity in the brain, which manifests as waves on an EEG recording. http://www.mayoclinic.com/health/eeg/MY00296. It is one of the main diagnostic tests for epilepsy and other brain disorders. Id.

[7] These studies provide information about the condition of nerve pathways, especially those in the brain and spinal cord. http://medical-dictionary.thefreedictionary.com/evoked+potential+studies.

[8] A BAEP is used to evaluate symptoms such as loss of balance, weakness, nausea, vomiting, hearing loss, unusual ringing in the ears, headaches, vision problems, or numbness. http://www. uihealthcare.com/topics/medicaldepartments/neurology/brainstemtest/index.html.

[9] A VEP is used to evaluate the visual pathways in the brain and is used when the subject is experiencing double vision, blurred vision, loss of all or part of vision, eye injuries, head injuries, or weakness of eyes, arms, or legs.

Wiggins also performed an EEG test, the results of which indicate a "normal EEG recording." (Allstate Ex. 16 at 3.)

On October 31, 2003 Thomer began physical therapy at Newtown-Jamison Physical Therapy. (Thomer Ex. 1 at 6.) Although her physical therapist noted improvement (Id. at 19-20), Thomer felt that she was not benefitting from the sessions and stopped attending them on January 26, 2004. (Id. at 13.)

On July 8, 2004, Thomer visited Dr. John E. Gordon, Ph.D., P.A., for a neuropsychological evaluation. (Allstate Ex. 18 at 1.) The results of this evaluation indicated that Thomer was at least average or above average in every category of cognitive testing. (Id. at 6.) Dr. Gordon could not link Thomer's symptoms with a brain injury because he found that "[t]he pattern of neuropsychological test results is not indicative of a well-lateralized or highly focal area of cortical level impairment which is significantly affecting her basic adaptive abilities at the present time." (Id.) However, he also found that Thomer had "a tendency to become easily overwhelmed when having to process too much information at one time" and that she was also "experiencing a significant degree of emotional distress." (Id.) In sum, Dr. Gordon believed that, in light of Thomer's history, Thomer had been experiencing the symptoms of "post-concussive syndrome, the recovery of which has been interfered with and complicated by the emotional sequelae from the incident." (Id.) He could not determine the nature of any physical limitations as they were "outside of [his] professional area." (Id.)

In a report rendered at the request of Thomer's counsel, on October 27, 2004, Dr. Wiggins stated, "Unfortunately, I cannot describe to you how a closed head injury of this degree

http://www.uihealthcare.com/topics/medicaldepartments/ neurology/veptest/index.html.

causes such dramatic neurocognitive symptoms," and recommended that Thomer receive a neuropsychological evaluation. (Allstate Ex. 83 at ALL1405).

On March 14, 2005, Thomer visited a dentist, Dr. Harry Habbell, D.D.S., complaining of three fractured teeth, which she claimed she sustained as a result of the April 15, 2002 MVA. (Allstate Ex. 21.) Whether Thomer's dental injuries were caused by the 2002 MVA is disputed by the Parties, because Thomer was involved in a MVA during the Summer of 1997 and, thereafter sought dental care claiming the injuries were a result of the 1997 MVA. (Allstate Ex. 22.)

On January 13, 2005, Thomer sought the care of neurologist Michael Martin Cohen, M.D. Thomer complained of headaches, vision, tinnitus,[10] vertigo, dizziness, chronic fatigue, anxiety attacks, neck pain with radiation into both trapezii, back pain and numbness and paresthesia[11] in both arms. (Allstate Ex. 5.) Dr. Cohen diagnosed Thomer with a cerebral concussion which caused a traumatic brain injury, producing cognitive impairment and behavioral changes, which he believed to be permanent given the length of time that they had persisted. (Allstate Ex. 25.) On a follow-up visit on March 15, 2005, Dr. Cohen recommended that Thomer continue to treat with craniosacral therapy as she believed it was most helpful to her. (Allstate Ex. 26.)

---

[10] Tinnitus is a ringing in the ears and is symptomatic of an underlying condition such as age-related hearing loss, ear injury, or circulatory system disorder. http://www.mayoclinic.com/health/ tinnitus/DS00365.

[11] Paresthesia is characterized by the National Institute of Neurological Disorders and Stroke as a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet. http://www.ninds.nih. gov/disorders/paresthesia /paresthesia.htm. It is usually painless and described as a tingling or numbness, skin crawling, or itching. Id.

On February 4, 2005, Thomer visited psychiatrist, Robert W. Mauthe, M.D., who diagnosed her with a closed head injury and possible Thoracic Outlet Syndrome ("TOS").[12] (Allstate Ex. 27 at 2.)  He found that Thomer's Myofascial Disorder was directly caused by the MVA.  (Id.)    On February 14, 2005, Thomer saw psychiatrist Dr. Robert L. Sadoff, M.D., who was unable to render a final opinion because he required additional information.  (Allstate Ex. 28 at ALL1429.)  As of March 9, 2005, after receiving the police report and the reports by Drs. M. Cohen and Mauthe, Dr. Sadoff was still not in a position to finalize his report.  (Allstate Ex. 29 at P2012.)  He recommended further psychological and neuropsychological tests as well as a referral to a competent cognitive therapist for more definitive treatment.  (Id.)  In the absence of Thomer's complete treatment records, Dr. Sadoff was only able to say that she "had symptoms of anxiety and depression which started when she had the accident."  (Id.)

On August 6, 2005, Thomer was admitted to the Emergency Room at Doylestown Hospital believing that she had experienced a seizure.  (Allstate Ex. 19 at ALL1280.)  Tests performed on Thomer that day revealed normal results.  (Allstate Ex. 19.)  Thomer's neurologic exam, EKG, and CT of the head were all normal.  (Id. at ALL121280-82.)  Thomer was released the same day she was admitted with a formal diagnosis of fainting.  (Id. at ALL1287.)

On November 8, 2005, Thomer was treated at the Penn Epilepsy Center.  (Allstate Ex. 30 at ALL1305.)  Dr. Susan Herman was unable to pinpoint the cause of Thomer's complaints but noted that there was possibly a presence of subclinical seizures, depression, and dementia.  (Id.)  On April 14, 2006, Dr. John Pollard, Attending Neurologist at the University of Pennsylvania,

_____

[12] TOS encompasses related syndromes that cause pain in the arm, shoulder, and neck. http:// www.ninds.nih.gov/disorders/thoracic/thoracic.htm.

performed an EEG on Thomer and found the results were normal.  (Id. at ALL1308.)

After 2005, Thomer continued to see a psychologist and had a follow-up with Dr. Cohen. (Allstate Ex. 6 at 5.)  Additionally, Thomer had been treating with craniosacral therapy since the MVA and she continued to do so until she exhausted her benefits in 2008.  (Allstate Ex. 31.)

## B. Allstate Terminates Payments to Thomer's Medical Providers

In April of 2003, Allstate stopped paying the bills submitted by Thomer's medical providers.  (Mot. Summ. J. at 8.) At this point, Allstate had serious reservations regarding the reasonableness and necessity of Thomer's treatment and requested that a Peer Review Organization ("PRO")[13] review the bills to determine whether treatment was reasonable.  (Id.) Allstate had paid all prior bills submitted by Thomer's care providers up to this time.  (Id.)  The PRO determined that "maximum medical improvement" was achieved by August 15, 2002 and, thus, treatment received after that date was not reasonable and necessary.  (Allstate Ex. 33 at 5.) Dr. Baron requested reconsideration of the PRO's decision, but failed to provide additional information requested by the PRO.[14]  (Opposition at 9.)  Ultimately, the PRO reached the

---

[13] Pennsylvania authorizes PRO's to evaluate the reasonableness and medical necessity of care, and the professional standards of performance, including the appropriateness of the setting where the care is rendered, and the appropriateness of the delivery of the rendered care in the context of automobile insurance claims.  31 Pa. Code § 69.51, 31 PA ADC § 69.51.

[14] An insurer, provider, or insured may request, in writing, reconsideration of the initial PRO decision within thirty days from the date the initial determination is effected. 31 Pa. Code § 69.52(h), 31 PA ADC § 69.52(h).  A PRO shall afford the party requesting reconsideration an opportunity to discuss the case with the reviewer and to submit additional information identified by the reviewer before making a final determination of the reconsideration.  31 Pa. Code § 69.52(j), 31 PA ADC § 69.52(j).

conclusion that treatment after May 24, 2002 was medically unreasonable and unnecessary.[15] (Allstate Ex. 35.)

## C. Thomer Seeks Payment for Neurological Treatment

In November of 2003, Allstate received bills for Thomer's treatment with neurologists, including the Neurology Group and Dr. Wiggins. (Allstate Ex. 36 at ALL0496.) These treatments reflected new diagnoses of myalgia[16] and myositis.[17] (Id.) Allstate decided it required an independent medical examination ("IME") to determine whether those conditions were caused by the accident. (Id.) However, in June of 2004, Thomer filed suit against Allstate alleging that Allstate's reliance on the PRO was done in bad faith and, as a consequence of the litigation, an IME was not performed.[18] (Allstate Ex. 38.)

Allstate and Thomer agreed to settle Thomer's first party medical loss benefits whereby Allstate paid all of Thomer's back medical bills, resumed payment of medical bills going forward, and payed $30,000 to Thomer and $11,983.00 to her for attorney, Robert Mangold, Esq. ("Mangold") in attorney's fees. (Allstate Exs. 45, 46.) In return, Thomer signed a release of her bad faith claims arising out her first party medical loss claim. (Allstate Ex. 47.) Allstate

---

[15] Thomer clarifies in her Opposition that she is not attempting to re-litigate the first-party med pay claim but that she includes the details of Allstate's handling of that claim in her Complaint to show that Allstate had further motivation to handle Thomer's UIM claim in bad faith. (Opposition at 34.)

[16] Myalgia is pain in one or more muscles. http://www.merriam-webster.com/medlineplus/ myalgia.

[17] Myositis is muscular discomfort or pain from infection or an unknown cause. http://www. merriam-webster.com/medlineplus/myositis.

[18] Allstate attempted to compel Thomer to undergo an IME but Mangold successfully opposed the Motion. (Allstate Ex. 39.)

continued to pay for Thomer's medical treatment until she exhausted the $100,000 medical loss policy limit. (Allstate Ex. 31.) Thomer also received the maximum benefits allowable under her income loss policy in the amount of $50,000. (Opposition at 1.) Thomer would eventually settle with the tortfeasor's insurer, Nationwide, for $50,000. (Reply at 25.)

**D.     The UIM Claim Settlement**

In July of 2005, Mangold forwarded Allstate various medical bills and demanded the full $100,000 UIM policy limit claiming that damages clearly exceeded the combined policy limits of Allstate and Nationwide of $150,000. (Allstate Ex. 50.) The primary source of valuation was an actuarial-economic report. (Opposition at 11.) At that time, Mangold also informed Allstate that he was pursuing a claim against Nationwide and that he was providing Allstate "with a credit for the $50,000 of coverage available to the tortfeasor." (Allstate Ex. 50.) Allstate adjuster, Martha Ruggero ("Ruggero"), reviewed the medical records, requested additional records and information from Mangold and, upon receipt, completed an evaluation of the claim. (Allstate Ex. 36 at ALL0545, ALL0552.) Ruggero determined that the UIM claim was worth between $35,000-$45,000, taking into account the $50,000 credit from Nationwide. (Allstate Ex. 53.) On October 28, 2005, Ruggero offered Thomer $30,000 to settle the UIM claim. (Allstate Ex. 56.)

Allstate alleges that neither Thomer nor her counsel responded to Allstate's initial offer for approximately seven months. (Mot. Summ. J. at 12.) Thomer does not contest this point. In the summer of 2006, Mangold forwarded Allstate additional medical records and reiterated the demand for the full policy limits. (Opposition at 13.) These records indicated the possible presence of subclinical siezures, depression, and dementia (Allstate Ex. 36 at ALL0574.) The claim entries also show that Dr. Cohen diagnosed Thomer with a closed head injury, post-

traumatic stress disorder, depression, and anxiety caused by the accident.  (Id. at ALL0580.)  At

this point, Ruggero submitted all of Thomer's medical records for review.  (Opposition at 13.)

The medical reviewer, Dr. Victor J. Malatesta, Ph.D., concluded that there was little evidence in

Thomer's records to indicate that she was incapable of working or performing activities of daily

living. (Allstate Ex. 6 at 6.)  Dr. Malatesta also noted that there was minimal neurospychological

data to address any work restrictions or limitations.  (Id.)

During the seven month period following the initial offer, Thomer fired Mangold

(Allstate Ex. 62) and replaced him with Terry Goldberg, Esq. ("Goldberg") (Allstate Ex. 63).

Goldberg notified Allstate of the change in representation on February 26, 2007.  (Allstate Ex.

63.)  By letter dated March 8, 2007, Goldberg wrote to Allstate requesting that Allstate send a

check made payable to Thomer and himself in the amount of $30,000.  (Allstate Ex. 64.)  It

seems Goldberg interpreted the initial $30,000 offer to mean that the $30,000 was undisputed.

(Id.)  Allstate promptly informed Goldberg that the entire claim was still in dispute.  (Allstate Ex.

65.)

Thomer submitted to an IME on August 1, 2007, which was performed by Lee J. Harris,

M.D.  (Allstate Ex. 4 at 1.)  Dr. Harris concluded that Thomer's "entire subjective symptom

complex is psychological in origin."  (Id. at 7.)  However, Dr. Harris could not rule out the

possibility that Thomer "might have a concussion causing a small minority of her symptoms."

(Id.)

On June 22, 2007, Allstate requested authorizations from Thomer so it could gather her

medical records.  (Allstate Ex. 66.)  Thomer did not return the authorizations for five months.

(Allstate Ex. 67.)  Around the time that Allstate requested the authorizations from Thomer, she

was representing herself *pro se* in another lawsuit involving a three-day jury trial, regarding payment to a contractor she had hired to perform work on her home.[19]  (Allstate Ex. 69.)  Allstate's receipt of the IME results and the discovery of Thomers *pro se* representation prompted Ruggero to reevaluate Thomer's claim in December of 2007.  (Mot. Summ. J. at 14.)  As a result of the second evaluation by Ruggero, Allstate raised the upper limits of the claim to $65,000.  (Id.)  On December 13, 2007, Allstate offered Thomer $50,000.  (Allstate Ex. 57 at ALL2363.)  There is some confusion between the Parties over whether Goldberg communicated to Allstate on December 13, 2007 that $90,000 would settle the case.  (Thomer Ex. 7 at 27.)  On December 18. 2007, believing that Thomer had decreased her demand to $90,000, Allstate offered the full $65,000 (Allstate Ex. 57 at 3).  Thomer rejected the offer.  (Allstate Ex. 72 at 38:1-48:1.)  In a letter to Allstate wherein Goldberg relayed he would apprise Thomer of the $65,000 offer, he also stated that his advice to Thomer was to continue to seek the policy limits.  (Allstate Ex. 73.)

     After Thomer rejected the offer of $65,000, the case proceeded to arbitration, which was scheduled for October 1, 2008.[20]  (Allstate Ex. 74.)  At some time prior to the scheduled arbitration, an evaluation consultant for Allstate granted authority to release up to $85,000.  (Allstate Ex. 54 at 124.)  On September 26, 2008, Allstate offered Thomer $75,000.  Thomer

     [19] Allstate considered Thomer's *pro se* representation as a factor in determining whether Thomer's injuries precluded her from working as she claimed.  (Mot. Summ. J. at 32.)

     [20] There was some difficulty in appointing a neutral arbitrator until July 9, 2008 and that the neutral arbitrator who eventually accepted the position scheduled the arbitration for October 1, 2008.  (Allstate Ex. 104.)

refused that offer.  On October 1, 2008, Allstate offered the full $85,000.[21]  Thomer again refused

the offer.  Owing in large part to the mistaken belief that Thomer would still settle for $90,000,

Allstate increased its offer to $90,000 that same day.  On October 28, 2008, Goldberg called

Allstate to refuse the offer.  On November 26, 2008, Goldberg requested the neutral arbitrator to

issue subpoenas for the first party med pay file and the UIM claim, which the neutral arbitrator

granted.  On December 3, 2008, Ruggero called Goldberg and offered the full policy limits of

$100,000.

On December 3, 2008, under the pressure of the subpoenas, Ruggero forwarded Goldberg

a release of the UIM claim, and asked him to submit any proposed changes.  (Mot. Summ. J. at

16.)  Goldberg did not send any proposed changes and on December 31, 2008, Ruggero issued

the settlement check for the policy limits of $100,000 without a release.  On January 6, 2010,

Thomer filed a complaint against Allstate alleging bad faith.

## II.     STANDARD OF REVIEW

### A.     Summary Judgment

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is

no genuine issue as to any material fact and the moving party is entitled to judgment as a matter

of law."  See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991).  The Court asks

"whether the evidence presents a sufficient disagreement to require submission to the jury or

whether . . . one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 251-52 (1986).  On a motion for summary judgment, the Court may not weigh the

_____

[21] Goldberg requested that the October 1, 2008 arbitration be rescheduled so that he could obtain Allstate's first party medical pay file and Allstate's file regarding the UIM claim. (Allstate Ex. 77.)

credibility or weight of the evidence, rather, we may only determine the existence of a triable issue of fact. Tangle v. State Farm Ins. Co.'s, No. 08-112, 2010 WL 3420661 at *3 (W.D. Pa. Aug. 4, 2010) (citing Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

# III.    DISCUSSION

Pennsylvania's cause of action against bad faith insurers arises under 42 Pa. C.S.A. §

8371.  It provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1)    Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2)    Award punitive damages against the insurer.
>
> (3)    Assess court costs and attorney fees against the insurer.

42 Pa. C.S.A. § 8371.  In the insurance context, the term bad faith has acquired a particular

meaning:

> *Insurance*.  "Bad faith" on the part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent.  For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.* good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (citing

Black's Law Dictionary 139 (6th ed. 1990)).  Further, bad faith must be proven by clear and

convincing evidence and not merely insinuated.  Id. (citing Cowden v. Aetna Cas. and Surety

Co., 134 A.2d 223, 229 (Pa. 1957)).  Finally, to recover under a claim of bad faith, the plaintiff

must show that the defendant did not have a reasonable basis for denying benefits under the

policy and that the defendant knew or recklessly disregarded its lack of reasonable basis in

denying the claim.  Id. (citing American Franklin Life Ins. Co. v. Galati, 776 F.Supp. 1054, 1064

(E.D. Pa. 1991)).  Under Pennsylvania law, a bad faith insurance practice can include an

unreasonable delay in handling claims.  <u>Ania v. Allstate Ins. Co.</u>, 161 F. Supp. 2d 424, 430 (E.D. Pa. 2001).

The broad language of section 8371 was designed to remedy all instances of bad faith conduct by an insurer, whether occurring before, during, or after litigation.  <u>Bombar v. W. American Ins. Co.</u>, 932 A.2d 78, 92 (Pa. Super. 2007) (citing <u>Hollock v. Erie Ins. Exch.</u>, 932 A.2d 78 A.2d (Pa. Super 2007)).  Therefore, an action for bad faith may also extend to an insurer's investigative practices.  <u>Id.</u>

Thomer argues that Allstate acted in bad faith during the overall handling of her UIM claim by unreasonably delaying the resolution of her claim and by its overall handling of the claim.  In support of her second theory of bad faith, Thomer cites to a number of specific instances of Allstate's alleged bad faith conduct.  They include:

1.  failing to include her wage loss and economic damage report ("Actuarial Report") in assessing the claim;

2.  Unreasonably delaying an independent medical exam ("IME") and statement under oath;

3.  failing to consider her treating physicians' diagnoses;

4.  unreasonably extending low offers for many years; and

5.  requesting that she sign a release relating to her UIM settlement.

We will address each contention in turn.

### A.    Whether Allstate Unreasonably Delayed in the Handling of Thomer's Claim

While delay is a relevant factor in determining whether the insurer has acted in bad faith, "a long period of delay between demand and settlement does not, on its own, necessarily constitute bad faith."  <u>Kosierowski v. Allstate Ins. Co.</u>, 51 F. Supp. 2d 583, 588-89 (E.D. Pa.

1999).  In order for an insured to recover for bad faith stemming from delay, an insured must demonstrate that "the delay is attributable to the defendant, that the defendant had no reasonable basis for the actions it undertook which resulted in the delay, and that the defendant knew or recklessly disregarded the fact that it had no reasonable basis to deny payment.  Wiedinmyer v. Harleysville Mut. Ins. Co., No 94-19450 1999 WL 1324202 at *215 (Pa. Com. Pl. Aug. 5, 1999) (citing generally Quaciari v. Allstate Ins. Co., 998 F. Supp. 578 (E.D. Pa. 1998)).

Throughout her brief, Thomer claims that Allstate delayed in investigating and settling her claim for a period of anywhere from three to six and a half years.  (Opposition at 1, 18, 31, 36).  The evidence shows that Thomer did not notify Allstate that she intended to pursue a UIM claim until July 29, 2005 and that Allstate issued a check for the policy limits on December 31, 2008.  We will not hold Allstate accountable for Thomer's three-year delay in bringing the UIM claim.  Therefore, the true length of time that this claim was pending was three years and five months (42 months).

We find that much of the delay was directly caused by Thomer or her counsel.  A brief chronological review of the events set forth above reveals that, after Allstate received Thomer's demand for the policy limits of her UIM benefits, it reviewed the medical records and  requested additional records from Thomer's attorney.  After receiving the additional records, Allstate evaluated the claim and extended an offer shortly after performing the evaluation.  Thomer did not respond for seven months.  Furthermore, when Thomer did respond, she did so by providing new medical records, and was, therefore, not resuming negotiations but effectively bringing her claim back to square one.  We will not attribute this period of delay to Allstate.  Although Thomer claims it was unreasonable to request a review of the records, we find that it was

reasonable, as Allstate had reservations regarding the extent of Thomer's injuries. Furthermore, Allstate requested that Thomer return medical authorizations on June 22, 2007 but Thomer did not return them until December 4, 2007. This accounts for an additional five months of delay which we deem is not attributable to Allstate.

We also find that some of the delay was outside the control of Allstate, and, therefore, not attributable to it. See, e.g., Pittas v. Hartford Life Ins. Co., 513 F. Supp. 2d 493, 502 (W.D. Pa. 2007) (four-month delay in hospital providing toxicology report necessary to evaluate claim not an "indication, evidence, or interference of conduct that imports . . . bad faith on the part of the insurer"). For instance, the Parties had difficulty choosing a neutral arbitrator when they finally agreed to who should be appointed, and an arbitrator declined due to a conflict of interest. It was not until five months after the first arbitrator declined the appointment that a second arbitrator accepted. The second arbitrator scheduled the arbitration for October 1, 2008. As noted above, the arbitration did not take place as scheduled because Thomer's counsel requested a continuance to obtain subpoenas for arguably irrelevant documents and was rescheduled for a later date. Moreover, we find that the delay attributable to Allstate is supported by a reasonable basis as it was actively engaged in investigation, valuations and negotiations.

In support of her assertion that her claim was unreasonably delayed, Thomer also argues that "almost five full years had passed" before Allstate requested an IME or a statement under oath. (Opposition at 23.) Thomer cites to Barry v. Ohio Cas. Group, No. Civ. A.3:04 188, 2007 WL 128878 (W.D. Pa. Jan 12, 2007) to support position that such a delay is bad faith as a matter of law. (Opposition at 23.)

We will first address whether Allstate unreasonably delayed in scheduling an IME. We

first note that while it is true that Thomer's MVA occurred in April of 2002 and that Thomer did not receive an IME until August 1, 2007, Mangold, however, did not demand the policy limits under the UIM policy until July 29, 2005. Prior to learning that Thomer intended to pursue a UIM claim, Allstate did request that Thomer have an IME during the first-party medical pay litigation but she successfully opposed it.[22] (Allstate Ex. 39; Order granting Pl.'s Mot. For Protective Order dated 12/17/2004.) Because Allstate had, in fact, requested an IME after the MVA but was unable to obtain one due to Thomer's resistance, we will only consider the period of delay in seeking an IME for the period from July 29, 2005, when Thomer notified Allstate of its intent to collect UIM benefits, to July 1, 2007, the date when Thomer submitted to an IME.

For the following reasons, we find that Allstate had a reasonable basis for the delay. After receiving notice of Thomer's UIM claim, Allstate adjuster Ruggero reviewed the medical records, which Mangold sent with the demand. (Allstate Ex. 51 at ALL1044). On August 31, 2005, Ruggero requested additional records from Mangold to complete the evaluation. (Id.) Mangold did not object to the request and provided the requested records on September 16, 2005. (Id.) On October 28, 2005, Allstate extended the initial settlement offer of $30,000 and informed Mangold that the offer included the pending $50,000 claim from Nationwide bringing the total tort value to $80,000. (Allstate Ex. 56.) Allstate alleges, and Thomer does not dispute, that neither Thomer nor her attorney acknowledged or responded to the offer for seven months.

In lieu of a response to the offer, Mangold sent additional medical records to Allstate on June 9, 2006, July 6, 2006, and August 3, 2006. (Allstate Exs. 57-59.) On August 9, 2006,

---

[22] According to Thomer, Allstate informed her that it sought to obtain an IME on November 29, 2004. (Allstate Ex. ¶ 39.)

Mangold renewed his demand for the full policy limits.  (Allstate Ex. 60.)  Due to the newly received medical records, the Allstate adjuster requested a doctor to perform a review of Thomer's records and received the report from such on December 1, 2006.  The record indicates that Thomer called Allstate on November 9, 2006 to report that she was no longer represented by Mangold.  (Allstate Ex. 36 at ALL0592.)  Thomer's new counsel, Goldberg, did not notify Allstate of his involvement of the case until February 26, 2007.  (Allstate Ex. 63 at ALL0985.)

Based on the above, we find that Allstate was not to blame for the seven month delay between Allstate's initial offer and Thomer's submission of additional medical records as Thomer's own unresponsiveness was significantly to blame.  We also find that Allstate cannot solely bear the blame for the period of inactivity from November 9, 2006 until February 26, 2007 during the transition of Thomer's counsel because her own actions contributed to the delay.

Furthermore, we find that Barry is not persuasive in the present circumstances.  In Barry, the insured did not undergo an IME until approximately sixteen months after the insurer was notified that the insured intended to pursue a UIM claim.  Barry, 2007 WL at *11.  The district court held that, considering the constant pattern of delay evidenced by the insurer,[23] the delayed IME was also done in bad faith.  Id.  Here, unlike in Barry, much of the delay in seeking an IME was directly caused by Thomer.  Thus, we find the present circumstances are factually distinguishable from those in Barry.

---

[23] For instance, the insurer requested the insured to forward a demand package though the policy did not require one,  assigned the claim to representative who had no experience with Colossus, failed to review the first-party file, failed to ask the insured to submit to a statement under oath, failed to seek the insured's medical records, failed to ask the insured to undergo a medical examination, and failed to seek or access the insured's employment history.  Barry, 2007 WL 128878 at *1, *8.

Regarding the delayed request to take Thomer's statement under oath, we find that Thomer has not demonstrated that it amounts to bad faith. Thomer provided a statement under oath on April 24, 2007. (Allstate Ex. 3 at 1.) As previously discussed, Allstate was actively investigating Thomer's claim from July of 2005 until the time it extended its first settlement offer in October of 2005. After receiving the first offer, Thomer and/or her counsel failed to respond for seven months, and then submitted new medical records in June, July, and August of 2006. (Allstate Exs. 57-59.) On November 9, 2006, after Thomer submitted the additional medical records, she notified Allstate that she had fired Mangold. (Opposition at 13.) Thomer's new counsel, Goldberg, informed Allstate of the change in representation On February 26, 2007. (Allstate Ex. 63.) During March of 2007, Goldberg suggested that Allstate schedule a statement under oath and Allstate agreed. (Allstate Exs. 65, 66.)

We find that, here, as was the case with the IME, Thomer and/or her counsel caused much of the delay in seeking a statement under oath. We further find that the periods of delay not attributable to Thomer may fairly be attributed to the need for further investigation, as Thomer submitted additional medical records, which Allstate submitted for review. Accordingly, we find that Thomer has not proven by clear and convincing evidence that there was no reasonable basis for the delay in seeking a statement under oath.

**B.     Allstate's Overall Handling of the Claim**

      1.    Allstate's Decision not to Include the Wage Loss and Economic Damage Report in its Evaluation

Thomer argues that Allstate's failure to consider the Wage Loss Report and Economic Damage Report prepared by Dr. Hopkins ("Hopkins Report"), submit it for economic review, or

provide its own economic report constitutes bad faith. (Opposition at 22.) Thomer argues that Allstate was obligated to consider the Hopkins Report because she had already received $50,000 in lost wages benefits from Allstate. (Opposition at 22.) Thomer also cites to the deposition testimony of the adjusters assigned to her case, who both state that Allstate only pays lost wages if an insured is disabled because of the accident in question and the insured has received a disability notice from a physician. (Allstate Exs. 2, 3.) Allstate contends that it was under no obligation to include the Hopkins Report in its consideration of the UIM claim because it was based on the assumption of permanent disability, which it seriously questioned. (Reply at 19.) Allstate also contends that paying lost wages benefits as a result of previous litigation does not preclude them from challenging UIM benefits. (Id. at 23.)

First, we find that Allstate's payment of Thomer's $50,000 policy limit does not preclude it from challenging the UIM claim. Allstate correctly states that, under Pennsylvania law "an insurer's payment of first part benefits does not preclude an insurer from later denying third party UM/UIM benefits." Pantelis v. Erie Ins. Exchange, 890 A.2d 1063 at 1068 (Pa. Super. 2006). In other words, "an insurer's payment of first party benefits does not, without more, constitute a binding admission of causation under either the statute or case law." Id. Accordingly, we find that, as a matter of Pennsylvania law, Allstate permissibly challenged and investigated Thomer's UIM claim. Thus, we will only grant summary judgment on this issue if Thomer has not demonstrated by clear and convincing evidence that Allstate did not have a reasonable basis for failing to include the Hopkins Report in its evaluations.

In preparing his Report, Hopkins relied on an October 27, 2004 report by Dr. Wiggins. (Opposition Ex. 4 at 1.) In that report, Dr. Wiggins stated that Thomer sustained permanent

injuries as a result of the April 15, 2002 MVA. (Allstate Ex. 83 at ALL1405.) However, Dr. Wiggins could not definitively state that the MVA caused the severe neurocognitive symptoms complained of by Thomer and recommended that Thomer seek the attention of a neuropsychologist for further evaluation. (Id.) It is clear that Dr. Wiggins had not been informed that Thomer had already been evaluated by neuropsychologist Dr. Gordon on July 8, 2004 or that the results of that examination were arguably detrimental to Thomer's claims of severe cognitive dysfunction. (Allstate Ex. 18 at 1.) Furthermore, when Allstate performed its evaluations, it referred to additional medical records that undermined Dr. Hopkins assumption of permanent disability such as normal MRIs of the brain and cervical spine and normal Visual Evoked Potential and EEG tests.[24] Allstate also relied on the following evidence in determining whether Thomer actually suffered from the injuries which Dr. Hopkins assumed were present and permanent:

1.   Thomer's refusal of emergency medical care on the date of the MVA;

2.   The fact that Dr. Baron's notes were illegible and provided no meaningful information to support her claim;

3.   Discharge papers for a month of physical therapy that Thomer underwent between early June and early July reported "overall improvement," "decreased pain, dizzy spells, decreased numbness and tingling down her upper extremity, and also that she was progressing in her overall functioning abilities;

4.   An August 2002 report by neurologist Dr. Jackel wherein he relates Thomer

---

[24] Allstate argues throughout its Motion for Summary Judgment and Reply that this "objective evidence" carries greater weight than "opinion" evidence from Thomer's examining physicians. However, on a motion for summary judgment, we may not weigh the evidence before us. Tangle, 2010 WL 3420661 at *3 (citing Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d at 1363). Thus, our inquiry is limited to whether Allstate had a reasonable basis for its decision. Terletsky, 649 A.2d at 688.

stated, "[Thomer] doesn't feel that pain is her big problem at this point;"

5.    Forensic psychologist Dr. Sadoff's report that Thomer "believes they [her cognitive problems] are all related to the injuries she sustained in the accident;"and

6.    Dr. Sadoff's inability to draw any final conclusions absent psychological and neuropsychological testing.

(Reply at 26-28).  In light of the conflicting medical records and uncertainty contained in the report relied on by Hopkins, we find that Allstate had a reasonable basis for not including the Hopkins Report in its evaluation.

2.    Allstate's Decision to Exclude Diagnoses of Concussions Throughout the Earlier Stages of Negotiations

Next, Thomer argues that Allstate's apparent disregard of her treating physicians' diagnoses amounted to bad faith.  (Opposition at 23.)  Specifically, Thomer takes issue with Ruggero's failure to include Dr. Cohen's and Dr. Jackel's diagnoses of a concussion in her evaluation until 2007.  (Id. at 24.)  As evidence of Allstate's alleged bad faith conduct, Thomer states that Allstate had no medical records to rebut the diagnoses and that Ruggero excluded the diagnoses on the basis of her own personal beliefs absent any medical support.  (Id.)  Thomer also claims that Allstate improperly ignored the results of the IME evaluation which suggested that Thomer may have suffered a closed head injury as a result of the MVA.  (Id.)  We disagree.

Allstate had in its possession medical records that discounted the existence of persistent injuries and, conversely, it also had in its possession evidence that contained diagnoses of permanent injuries.  Medical records that supported Allstate's uncertainty regarding Thomer's injuries include the May 8, 2002 evaluation at Doylestown Hospital, which revealed a normal brain MRI and a normal cervical spine MRI.  (Allstate Ex. 11.)  Those records also included the

results of a Visual Evoked Potential test and an EEG test, both of which were normal. (Allstate Ex. 16.) Furthermore, Ruggero stated in her deposition that she relied on a medical report where the examiner "questioned all these symptoms that [Thomer] had" and "wanted a neuro-psych testing done," the police report and the fact that Thomer repeatedly declined emergency medical care on the date of the MVA. (Opposition Ex. 2 at 216.) Records that contained diagnoses indicative of a persistent injury included Dr. Cohen's diagnosis of blurry vision secondary to a concussion, Dr. Jackel's diagnosis of a concussion, Dr. J. Cohen's diagnosis of a concussion and Dr. Baron's diagnosis of a closed head injury. Although Thomer argues that Dr. Harris' diagnosed her with a concussion at her IME, that it not what his report actually states. Dr. Harris' report actually states, "I suspect that Ms. Thomer's entire subjective symptom complex is psychological in origin, although I cannot rule out the possibility that she might have had a concussion causing a small minority of her symptoms." (Allstate Ex. 4 at ALL1228.)

In light of the unclear nature of Thomer's injuries evidenced by the conflicting medical records, we find that Allstate had a reasonable basis to question the diagnoses of Thomer's treating physicians.

### 3.     Allstate's Negotiations

In addition, Thomer alleges that Allstate's repeated "low-ball" offers throughout the claim handling process amounted to bad faith. (Opposition at 25.) Allstate contends that its offers were at all times reasonable because all increased offers resulted from either new information or other relevant factors. (Reply at 20-21.)

Part of Thomer's argument relating to Allstate's bad faith negotiations rests on the proposition set forth in <u>Barry</u>, 2007 WL 128878, that increasing an offer without any additional

evidence may constitute bad faith. Barry, 2007 WL 128878 at *27. In Barry, the insurer

increased its offer from $6,000 to $25,000 within a two-week period absent any additional

evidence. Barry, 2007 WL at *8. The district court held that "low-ball offers which bear no

reasonable relationship to an insured's actual losses can constitute bad faith within the meaning

of § 8371." Id. Accordingly, the court further held that a reasonable jury could conclude, on the

basis of clear and convincing evidence, that the insurer acted in bad faith by offering the insured

unreasonably low offers during the negotiations. Id. Thomer argues that Allstate's increased

offers after December of 2007 were similarly made without any new evidence and were, thus, in

bad faith.

Allstate counters that Barry goes against the weight of authority and was wrongly

decided. (Reply at 18.) In support of its argument, Allstate cites to a plethora of cases holding

that offers substantially below the ultimate settlement or arbitration value of a case do not

constitute bad faith. (Mot. Summ. J. at 23.) In addition, Allstate urges us to consider Brown v.

Progressive Ins. Co., 860 A.2d 493 (Pa. Super. 2004), where the Superior Court reversed a

verdict in favor of the insured where the insurer's initial offer was $0 but the case settled for

$25,000 prior to arbitration. 860 A.2d at 502-03. There, the insurer valued the claim at less than

the credit from the tortfeasor. Id. Brown held that the insurer's initial offer did not reflect bad

faith because the insurer reasonably believed that it owed its insured nothing. Id. Thus, the court

held that a low but reasonable offer did not constitute bad faith. Id. at 501-02. Allstate also

argues that Brown stands for the proposition that an insured may only prevail on Thomer's theory

if the insurer had no reasonable basis for its initial valuation of the claim and its subsequent

offers. (Mot. Summ. J. at 25.) We agree, and we find that Allstate had a reasonable basis for its

initial valuation and subsequent offers.

First, we find that, under <u>Brown</u>, Allstate's initial offer was reasonable.  As we have already found that Allstate had a reasonable basis for its initial evaluation, we must now determine whether Allstate's initial offer of $30,000 based on a claim valuation of $35,000 to $45,000 was reasonable.  It is well settled that negotiation of a claim does not qualify as bad faith.  <u>See</u>, <u>Kosierowski</u>, 51 F. Supp. 2d at 592; <u>Williams</u>, 83 F. Supp. at 576.  Furthermore, offering an amount at the lower estimated settlement range does not qualify as bad faith. <u>Kosierowski</u>, 51 F. Supp. 2d at 592.  We find that Allstate's opening negotiating figure of $30,000, which is only $5,000 less than the estimated amount of $35,000 to $45,000 does not amount to bad faith.

Thomer also argues that Allstate's offers of $50,000 and $65,000 were also in bad faith because Allstate received no new evidence to alter the value of the claim.  However, we find that Allstate did receive new evidence, which included a medical records review, a neurological IME, and Thomer's statement under oath.  Additionally, Allstate was aware that Thomer had continued treatment after the initial offer.  After evaluating the additional evidence, Allstate raised the upper limits of the claim value to $65,000.  Allstate offered $50,000 on December 8, 2007. Considering the new medical records that Allstate received from Thomer, we find that the new claim value was reasonable and that Allstate's offer of $50,000 was also reasonable.  Goldberg offered to settle for $90,000 in exchange for a quick resolution, and Allstate then offered the full $65,000 on December 13, 2007.  Thomer made no additional counter-offer at that point and Thomer retreated to her demand for the policy limits.

Lastly, Thomer asserts that Allstate's offers above $65,000 were also done in bad faith

because it received no new evidence. However, Allstate contends that there were additional *factors* that caused it to finally settle for the policy limits. (Reply at 22) (Italics added). Those factors included Thomer's continued treatment despite the fact that her first party benefits had been exhausted, Goldberg's threat of a bad faith lawsuit, Goldberg's subpoenas for the first party file and the UIM file, and Goldberg's intent to depose the Allstate adjusters assigned to Thomer's case. (Id.) All the while, Thomer insisted upon policy limits. We find that, for these reasons, it was not unreasonable for Allstate to increase the offer from $65,000 to $100,000.

4.     The UIM Release

Lastly, Thomer claims that Allstate acted in bad faith by forwarding her a release prior to settling for the policy limits. (Opposition at 35.) Thomer further argues that this action is additional evidence of a pattern of bad faith conduct. We disagree. In <u>Kosierowski v. Allstate Ins. Co.</u>, the insured claimed that the insurer's request that she sign a release of her bad faith claim while settling the substantive components of her case amounted to bad faith. 51 F. Supp. 2d at 593. The court found there was no bad faith because there was no evidence that the insurer attempted to mislead or deceive the insured. <u>Id.</u> The court noted that "it is not inappropriate for an insurance company to attempt to resolve all claims with one settlement, particularly when there is no indication of an intent to mislead." <u>Id.</u> (string citation omitted).

Allstate contends that its request for a release was permissible, not intended to extend to claims for bad faith arising out of the UIM claim, subject to modifications by Thomer, and reasonable in light of Thomer's previous attempts to renege on other settlements. (Mot. Sum. J. at 37-38.)

We find that Allstate's request for Thomer to sign a release was permissible as there is no

evidence that it was done with any intent to mislead or deceive Thomer.  We recognize that the parties dispute whether the phrase "any and all liability and from any and all contractual obligations whatsoever under the coverage designated above" contained in the UIM Release extends to claims for bad faith.  However, we find that Thomer's ability to modify the release, which it did not do and Allstate's issuance of the settlement check without a signed release dispels any indication of bad faith.  (Allstate Ex. 36 at ALL0757, ALL0761.)  We also find that Allstate's request that Thomer sign the UIM release was inherently reasonable as there is evidence in the record that Thomer had attempted or at least requested (her counsel) to renege on previous settlements.  The record reflects correspondence between Thomer and her former counsel, Mangold, indicating that Thomer had urged him to "unsettle" the 2005 first-party med pay claim and bad faith claim.  (Allstate Exs. 88, 91.)  There is also evidence in the record that Thomer requested Mangold to "unsettle" the Nationwide settlement.  (Allstate Ex. 92.)  In view of Thomer's reluctance to accept the finality of previous settlements, we find that Allstate had a reasonable basis for requesting a release.

IV.    **CONCLUSION**

In conclusion, we find that Thomer has not demonstrated by clear and convincing evidence that Allstate acted in bad faith, because we find that it had a reasonable basis for each of the actions which Thomer argues was in bad faith.  Furthermore, we find that Allstate's actions as a whole do not constitute bad faith.  Thus, we will grant summary judgment in favor of Allstate.

An appropriate Order follows.